FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 DEC -7  AM 8: 03

U.S. DISTRICT COURT
N.D. OF ALABAMA

RONALD E. GLOVER,                    )
                                     )
        Plaintiff,                   )
                                     )
    vs.                              )        CV 98-BU-1211-S
                                     )
MIDLAND MORTGAGE COMPANY OF          )
OKLAHOMA, INC.,                      )
                                     )        ENTERED
        Defendant.                   )
                                              DEC 07 1998

## Memorandum Opinion

Under 28 U.S.C. § 1447(a), the district court may "at any time prior to final judgment" remand a case to state court if "it appears that the district court lacks subject matter jurisdiction." The court also notes that it is free, at any time during the proceedings of a case to evaluate its subject matter jurisdiction. Federal Rule of Civil Procedure 12(h)(3).[1] Upon reviewing the file, the court determines that jurisdiction is lacking and the matter will be REMANDED to the Circuit Court of Jefferson County, Alabama.[2]

---

[1] While Federal Rule of Civil Procedure 12(h)(3) requires dismissal on a finding that jurisdiction is lacking, 28 U.S.C. § 1447(a) expressly permits remand.

[2] In so doing, the court is aware that it avoids a rather dicey question, i.e., whether the law of the case doctrine prevents reconsideration of the remand issue in this case. While the court can reevaluate its jursdiction and the propriety of remand at any time, this reevaluation may be confined solely to the factual predicates of jurisdiction and those issues of law that have not been previously addressed. Reevaluation of the law pertaining to the court's jurisdiction may however be barred. This court concludes, however, that its ability to reevaluate jurisdiction extends to previously explicated law.

The district court earlier concluded that remand was inappropriate because the plaintiff satisfied the amount in controversy requirement of the diversity jurisdiction statute 28 U.S.C. § 1332(a). Upon reconsideration, this court reaches a different conclusion. The court also concludes that although there may exist bankruptcy jurisdiction over the instant case, the case should be equitably remanded to the state court.

In resolving the issues pertaining to removal and remand, the court first notes certain precepts that are well-established in this circuit:

> . . . On a motion to remand, the removing party bears the burden of establishing jurisdiction. *See Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353, 1356 (11th Cir. 1996). The removal statute should be construed narrowly with doubt construed against removal. *See Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107-09 [] (1941).

*Diaz v. Sheppard*, 85 F.3d 1502, 1505 (11th Cir. 1996).[3]

## Facts

The named plaintiff in the instant case asserts the existence of a purported nationwide class action against the defendant Midland Mortgage Company of Oklahoma, Inc. ("Midland"). According to Glover, Midland, a servicer of home mortgages, charges borrowers in default on their loan payments monthly "property inspection fees," which, he alleges, are not permitted by applicable loan documents and are not necessary for Midland to protect its security interest in the borrowers' real property.

On January 23, 1997, the plaintiff filed a bankruptcy petition under Chapter 13 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Alabama. During proceedings in that court, Midland filed a proof of claim that included the property inspection fees that are the subject of the instant suit. The plaintiff included the property inspection fees among the claims that he would repay under his Chapter 13 plan.

---

[3] For an excellent recent discussion of the justifications for and against strictly construing the extent of subject matter jurisdiction in the context of whether a district court has the authority to address an issue of personal jurisdiction where it arguably does not have subject matter jurisdiction, *see Marathon Oil Co. v. Ruhrgas*, 145 F.3d 211 (5th Cir. 1998) (en banc) (holding that subject matter jurisdiction must be resolved before the personal jurisdiction issue is addressed).

Contentions & Analysis

Two bases for removal were originally proposed by the defendant in the instant action. First, the defendant contended that removal was proper under 28 U.S.C. § 1441(a) & (b) because diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. It was on this basis that the court earlier denied remand. The defendant also argued that removal was appropriate under the bankruptcy removal statute, 28 U.S.C. § 1452, because the instant case is related to a bankruptcy action under 28 U.S.C. § 1334.[4] The district court did not address this argument.

### DIVERSITY OF CITIZENSHIP.

The general removal statute, 28 U.S.C. § 1441(a), permits a defendant to remove from state to federal court "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." In the instant case, it was determined that the court had original jurisdiction over the action based on diversity of citizenship. The requirements of diversity jurisdiction under 28 U.S.C. § 1332(a)(1) are, first, complete diversity of state or foreign citizenship between the plaintiffs and all defendants (*see Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806) and *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978)) and satisfaction of the present statutory amount in controversy requirement of over "$75,000.00, exclusive of interest and costs." There is no issue here that diversity of citizenship exists between the parties; the named plaintiff is an Alabama citizen and Midland is, apparently, a citizen of the State of Oklahoma. *See Supreme Tribe of Ben Hur v. Cauble*, 255 U.S. 356, 364-65 (1921. Instead, the court focuses its attention on whether the amount in controversy requirement has been met.

The court based its earlier opinion that jurisdiction exists on the grounds that the named plaintiff sought, on behalf of the putative class, injunctive relief that could be aggregated and that any class-wide attorneys' fee award would be aggregate relief. For the following reasons, the court will depart from that earlier ruling.

---

[4] The defendant mislabeled the claim as one involving the district court's exclusive jurisdiction over the distribution of an estate under the Bankruptcy Code. 28 U.S.C. § 1334(e). However, the instant case involves claims potentially "related to" the plaintiff's bankruptcy action, *In re Ronald Glover*, 97-00556-TOM-13 (N.D. Ala.).

AGGREGATION OF ATTORNEYS' FEES.

The court earlier held it appropriate to aggregate any attorneys' fees that might be awarded and to attribute the amount of those fees to each plaintiff. This conclusion extends the rationale of *Tapscott v. MS Dealer Serv. Corp.*, 77 F.3d 1353 (11th Cir. 1996), to the aggregation of attorneys' fees to satisfy the amount in controversy requirement in cases involving class claims. This court is aware of a substantial difference of opinion on the issue of whether, and under what circumstances, an attorneys' fee award creates a common and undivided right of a group of plaintiffs subject to aggregation. In explicating the rationale behind such an extension, the court will briefly review *Tapscott* and some of the history behind it.

In *Oliver v. Alexander*, 31 U.S. (6 Pet.) 143 (1832), a group of plaintiff seamen attempted to appeal a ruling regarding the recovery of wages, though the claims of none of the individual seamen surpassed the amount in controversy requirement of two thousand dollars for appellate jurisdiction. The Court determined that, although under admiralty law the seamen could jointly bring their contract claims, the claim of each seaman was "distinct and several." *Id.* at 147.

> One seaman cannot appeal from the decree made in regard to the claim of another; for he has no interest in it, and cannot be aggrieved by it. The controversy, so far as he is concerned, is confined solely to his own claim; and the matter of dispute between him and the owners, or other respondents, is the sum or value of his own claim, without any reference to the claims of others. It is very clear, therefore, that no seaman can appeal from the district court to the circuit court, unless his own claim exceeds fifty dollars; nor from the circuit court to the Supreme Court, unless his claim exceeds two thousand dollars. And the same rule applies to the owners or other respondents, who are not at liberty to consolidate the distinct demands of each seaman into an aggregate, thus making the claims of the whole the matter in dispute; but they can appeal only in regard to the demand of a seaman which exceeds the sum required by law for that purpose, as a distinct matter in dispute.

*Id.* at 147-48. This holding of the Supreme Court, that separate and distinct claims of plaintiffs cannot be aggregated to satisfy jurisdictional prerequisites, has been reaffirmed several times. See *Steward v. Dunham*, 115 U.S. 61, 64-65 (1885)(requisite amount in controversy for appeal to Supreme Court not satisfied); *Troy Bank of Troy, Indiana v. G.A. Whitehead & Co.*, 222 U.S. 39, 40-41 (1911) ("When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; but when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount").

Although plaintiffs with separate and distinct claims are not permitted to aggregate those claims to reach the amount in controversy, where the matter in controversy involves a collective right, not particular to each individual plaintiff, the Court has held that aggregation is permissible. *See The 'Connemara'*, 103 (13 Otto) 754, 755-56 (1880). Thus, where a group of plaintiffs "have a common and undivided interest in the matter in controversy" aggregation is appropriate. *Gibbs v. Buck*, 307 U.S. 66, 74 (1939).

In *Snyder v. Harris*, 394 U.S. 332 (1969), the Supreme Court addressed the question of whether the claims of the plaintiffs in a class could, merely by virtue of the plaintiffs' class status, be aggregated to satisfy the amount in controversy requirement. The Supreme Court rebuffed this suggestion, holding that the mere fact that plaintiffs bring their action as a class does not justify aggregating the plaintiffs' claims for satisfaction of the amount in controversy. *Id*. at 338. Only those "cases in which a single plaintiff seeks to aggregate two or more of his own claims against a single defendant" or "in which two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest" would aggregation be permitted. *Id*. at 335.

In considering what constitutes a common and undivided interest susceptible to aggregation, the Fifth Circuit Court of Appeals has stated:

> "Aggregation" of damages allegedly owed to separate plaintiffs, however, may be permitted in the limited situation where "two or more plaintiffs unite to enforce a single title or right in which they have a common and undivided interest." *Snyder*, 394 U.S. at 335 []. Unfortunately, the "common and undivided" test retains an amorphous quality. In applying this standard, many courts have failed to eschew labels. And stating the maxim is far easier than determining the principles that undergird it. The standards that have developed in this area largely have their origins in pre-Federal Rules caselaw and take their modern day form by only judicial application.
>
>            \* \* \*
>
> Courts generally agree that the plaintiffs' claims of right must be "integrated," meaning that their respective rights to damages arise from the same legal source. *See Texas & Pac. Ry. v. Gentry*, 163 U.S. 353, 362-63 [] (1896) (holding aggregation proper where plaintiffs "all claimed under one and the same title"). The application of this standard depends upon the history-laden notion of what constitutes an individual cause of action. Therefore, a necessary first step is an examination of the configuration of the state-law right at issue. *See, e.g., Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia (ANPAC) v. Dow Quimica de Colombia S.A.*, 988 F.2d 559, 563-64 (5th Cir. 1993) (examining Texas state law to determine whether fishermen had common property right in fishing stock harmed by oil spill), *cert. denied*, 510 U.S. 1041 [] (1994) (hereinafter "ANPAC"). Again, the purpose of this inquiry is to determine whether the state law claim creates one right of recovery. *Id*. at 564.
>
> Another factor that courts long have used to determine whether a claim is common or separate is the apportionment of the award. A claim is more likely to be integrated if the

> defendant has no interest in the apportionment of an award among the plaintiffs.
>
>> Plaintiffs, of course, may have strong interests in the eventual distribution of awards,
>> but the ultimate separability of a claim does not defeat its integrated quality. "Occasionally,
>> plaintiffs seek to enforce a common interest that is separable amongst themselves. In such
>> cases, the common nature of the plaintiffs' interest vis-a-vis the defendant dictates that
>> aggregation is proper." 1 MOORE, supra, P 0.97[3], at 921.

*Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1330-31 (5th Cir. 1995). In *Allen*, the Fifth Circuit determined that, under the law of the State of Mississippi, a claim for punitive damages was a common and undivided interest in which all plaintiffs to an action partook, permitting aggregation of the plaintiffs' punitive damages claims to satisfy the amount in controversy requirement of § 1332(a)(1).

The Eleventh Circuit Court of Appeals soon followed the Fifth Circuit in holding that in certain cases, under the State law of Alabama, claims for punitive damages were aggregable. *Tapscott v. MS Dealer Service Corp.*, 77 F.3d 1353, involved a putative class action brought originally in the Alabama state court for violations of the Alabama Mini-Code. The defendants removed the case to the district court, claiming, among other things, that although each individual plaintiff's claim for compensatory damages might not exceed the then-existing amount in controversy requirement of $50,000.00, the value of any punitive damages claim, taken as an indivisible whole, was greater than the required amount. The court determined that the punitive damages that would be awarded on the plaintiffs' claim should be treated as an aggregate whole and that, therefore, the amount in controversy would surpass $50,000.00. *Tapscott v. MS Dealer Service Corp.*, CV 94-PT-2027-S (N.D. Ala. 1994). The plaintiffs requested and the court certified the case for interlocutory appeal under 28 U.S.C. § 1292(b), which the Eleventh Circuit Court of Appeals granted. *Tapscott v. MS Dealer Service Corp.*, 77 F.3d at 1355-56.

On appeal, the Eleventh Circuit Court of Appeals affirmed this court's conclusion that, in certain cases, punitive damages can be aggregated. *Id.* at 1359. The court first noted that "the purpose of punitive damages in Alabama is to deter wrongful conduct and punish those responsible." *Id.* at 1358. Because "any punitive damage award . . . would be made on the wrongfulness of the defendant's course of conduct as a whole," "it is entirely proper that damages be considered in the aggregate." *Id.* at 1358-59. Further, the court noted, the defendant "is not concerned with the particular distribution of the punitive damages among the plaintiffs, but with the overall size of any such award." *Id.* at 1359. "[T]he failure of one plaintiff's claim will increase the share of successful

plaintiffs." *Id.*[5] The court concluded with the following caution, however: "While the facts of this case result in an aggregation of punitive damages, other factual situations may indicate that punitive damages are non-aggregable." *Id.*

Under the American Rule, each party to litigation is responsible for paying its own attorneys' fees. *See Alyeska Pipeline Service Company v. The Wilderness Society*, 421 U.S. 240, 247 (1975); *Hall v. Cole*, 412 U.S. 1, 4 (1973). There are, however, various exceptions, both equitable and statutory, existing under both federal and state law to this rule. *See Alyeska Pipeline Service Company*, 421 U.S. at 258-59. Under federal law, in addition to numerous statutory attorneys' fee provisions, *see id.* at 260 n.33, there exist three exceptions to the American Rule.

> In *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), the 1853 Act [specifying the limitations on costs that could be taxed against a losing party, presently ensconced in the United States Code at Tile 28, sections 1920 and 1923] was read as not interfering with the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit. That rule has been consistently followed. Also, a court may assess attorneys' fees for the 'willful disobedience of a court order . . . as part of the fine to be levied on the defendant(,) [],'; or when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . ..' These exceptions are unquestionably assertions of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress. . . .

---

[5] The holdings of the courts in *Allen* and *Tapscott* have not been universally followed, however. In *Gilman v. BHC Securities, Inc.*, 104 F.3d 1418, 1429 (2[d] Cir. 1997), the Second Circuit Court of Appeals stated that aggregation is appropriate where "the underlying claim — the basis on which such damages are sought — asserts a single title or right," rather than where the relief, considered in isolation from the separate nature of the claims, was collective.

> One feature of "common and undivided" interests in a single title or indivisible res is that the rights to such interests cannot be determined without implicating the rights of every other person claiming a similar entitlement. Manifestly, punitive damages do not work that way. As the court in *Allen* acknowledged, punitive damage claims entail the "potential for multiple liability." 63 F.3d at 1334. It cannot be denied that Gilman and his putative class members could "sue separately for punitive damages, and, whether they prevail[ed] on the merits or not, whether they [were] awarded punitive damages or not, the rights of subsequent plaintiffs [would] remain unaffected." *See Bishop v. General Motors Corp.*, 925 F. Supp. 294, 298 (D.N.J. 1996). Punitive damages claims thus cannot be deemed the type of single, indivisible res in which--under the classic "common fund" analysis — multiple plaintiffs share a common and undivided interest that justifies aggregation. Claims for punitive damages, like claims for compensatory damages, are "brought together in a class action only for the convenience of the plaintiffs." *Id.* . . .

*Id.*

In *Ard v. Transcontinental Gas Pipe Line Corp.*, 138 F.3d 596, 602 (5th Cir. 1998), the Fifth Circuit Court of Appeals limited *Allen* to class actions arising under Mississippi law, holding that "ordinarily the punitive damage claims of multiple plaintiffs may not be aggregated for purposes of determining jurisdictional amount." Arguably, there may be no circuit conflict.

*Id.* at 257-59 (internal citations omitted).[6]  The argument that any fee award in this case should be aggregated involves the first of these exceptions, the common fund doctrine, under which an attorney recovering a fund "for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Company v. Van Gemert*, 444 U.S. 472, 478 (1980).

In *Culverson v. General Motors Acceptance Corp.*, CV 96-B-3331-J (N.D. Ala. 1997), the plaintiffs filed a putative class action in state court claiming that the defendant breached the Alabama Mini-Code, § 5-19-1.  The defendant removed, contending that the attorneys' fees from a common fund award could be aggregated and that the value of the attorneys' fees would exceed the amount in controversy.  The court agreed.  In so holding, the court first made the following observation about *Tapscott*:

> First, *Tapscott* held that even where a class action involves "separate individual contract claims between the parties and not a single wrong by [defendant], such as a mass tort," punitive damages may nonetheless be aggregated to determine the amount in controversy.  Id. at 1358-59.  The court's holding suggests that the proper focus of that determination is on the nature of the relief sought.  *See id.* at 1358.
> * * *
> This case, if certified as a class action, would involve claims arising out of many individual contracts.  *Tapscott* has debunked the notion that such a case only concerns separate and distinct claims.  Just as mass tort claims touch upon common and undivided interests, a class action involving individual contract claims may do so as well.  *Id.* at 1358.  Thus, the scope of the present inquiry must focus upon the relief to be aggregated: attorney fees.

*Id.* at 5-6 & 7-8.

This court respectfully declines to follow the *Culverson* court's interpretation of *Tapscott*, that the focus of analysis in determining aggregation of claims is the relief sought.  In determining the focus of its analysis, the panel in *Tapscott* first stated that "[w]hether punitive damages are aggregable cannot be determined on the distinction of whether they arise from multiple individual transactions or from a single act or mass tort."  *Tapscott v. MS Dealer Service Corp.*, 77 F.3d at 1358 n.11.  The court then discussed *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia ("ANPAC") v. Dow Quimica de Colombia, S.A.*, 988 F.2d 559, 563 (5th Cir.1993), *cert. denied*, 510 U.S. 1041 (1994).  In *ANPAC*, the Eleventh Circuit Court of Appeals noted, the plaintiffs filed a

---

[6] The court notes that many of these federal equitable doctrines have state law analogues.  In diversity actions, those analogues may provide the basis for an attorneys' fee award, although federal equitable principles may not, so long as the rule providing for or denying sanctions is substantive, rather than merely procedural.  *See Chambers v. NASCO*, 501 U.S. 32, 52 (1991); *Ashland Chemical, Inc., v. Barco, Inc.*, 123 F.3d 261, 264 (5th Cir. 1997)

claim in federal court seeking damages from a mass tort caused by the defendant. While the source of the injury was a single wrong, the Fifth Circuit Court of Appeals held that the claims of the plaintiffs could not be aggregated because, as the *Tapscott* court put it, "each claim will vary based upon the particular plaintiff's injuries." *Tapscott, supra*, at 1358 n.11. The Eleventh Circuit Court of Appeals concluded:

> Even though the plaintiffs' injuries were caused by a single act of the defendant, the nature of the right and remedy sought was still particular to each individual plaintiff. *ANPAC demonstrates that the proper focus is on the nature of the claim or right asserted and not on the nature of the wrong underlying the suit.*

*Id* (emphasis added); *See also Gilman v. BHC Securities, Inc.*, 104 F.3d at 1429. It is, therefore, not the relief sought which is the centerpiece of any inquiry, but the right to be protected or redeemed by the award that is the focus of any inquiry into whether aggregation is appropriate. In *Tapscott*, as in *Allen*, the court noticed a curious fact about certain claims for punitive damages: an award of such damages is not a necessary consequence of the violation of any right of the plaintiff, but is instead contingent on wrongdoing by the defendant. *Id*. at 1358. In that sense, there is no underlying right of the particular plaintiff on which integration can be assessed. Instead, the plaintiff stood in the shoes of the state in seeking punitive damages. *Id*. As a result, the award of punitive damages would be on that collective and integrated right, rather than any specific right accruing solely to any plaintiff.

Such is hardly the case here. In this case, the attorneys' fees are merely a portion of the total award which each plaintiff would receive on his or her respective claims. *See Campbell v. General Motors Corp.*, — F. Supp. 2d —, —, 1998 WL 637334 at *7 (N.D. Ala. 1998). The underlying right remains the same, the attorneys' fees are merely a means to that ends in that the fees allow the putative class plaintiffs the ability to pursue the relief where it might otherwise be unprofitable for each plaintiff to do so.

Even examining, as a secondary matter, the type of relief sought, the court concludes that attorneys' fees collected out of any fund-type award are not aggregable. The *Culverson* court stated that the purpose of attorneys' fees in class action suits in which the fees will come from a common fund was essentially collective:

> Attorneys fees awarded from a common fund simply provide compensation for the attorneys who organize, pursue, and, in the event of a favorable judgment, administer relief in a class action. The Supreme Court has "recognized consistently that a litigant or a lawyer

who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund *as a whole*." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (emphasis added). The Court bases this exception to the general rule that litigant must bear their own costs upon "the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Id. See also Camden 1 Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 770-71 (11th Cir. 1991) (discussing the rationale underlying the "well-established common fund exception" to the American Rule that all parties bear their own costs of litigation). Thus, in economic terms, an award of attorney fees represents the cost of collective action allocated to all who benefit, thus preventing a "free-rider" problem.

For the present case, an award of attorney fees from a common fund must be viewed as an award for the "public benefit — the collective good" that is shared among all class members and not the right of an individual plaintiff. If successful, the attorneys in the present case will have made possible the recovery of damages for each class member. An award from the common fund ensures that each party bears a fair share of the legal bill. Once an award of fees is granted, class members can certainly determine what "contribution" they made to the fees. But while an accounting of costs may be theoretically possible, the benefit is in fact common and undivided. The fees that each class member contributes cannot be considered individually because individual members cannot forego their contribution. If class members had such a choice, no rational class member would contribute and, consequently, no attorney fees would be paid. Without the prospect of being compensated for their services, no rational attorney would undertake such a case. By serving as an incentive that makes the lawsuit possible, attorney fees — taken as a whole — comprise a shared interest among class members.

*Culverson, supra* at 8-9 (footnotes omitted). This rationale equally applies to a lump sum damages award from which any common fund attorneys' fee award is drawn.

On rationale given for the aggregation of a common-fund attorneys' fee award is that any relief that would allow plaintiffs to pursue actions that would otherwise be either absolutely or practically barred to them is a benefit accruing to the public. This definition of public benefit construes a public benefit as a general societal benefit, unconfined to the subject matter of the case. With certain punitive damage awards, the public benefit conferred is case-specific: It is retribution for the acts of the defendants that got those defendants hailed into court in the first place. With attorneys' fees awarded pursuant to the common-fund doctrine, the public benefit has nothing to do with the value of the case itself. Instead, it is a general benefit in that individually "undesirable" claims can be brought, regardless of substance. Furthermore, a plaintiff attempting to obtain punitive damages stands in the shoes of the state. Attorneys' fees do not carry this connotation. There is no sense in which the state has determined the acts of defendants against the public good, such that the plaintiffs stand in the state's shoes in seeking to gain a common fund award from which the attorneys fees may be drawn. Quite simply, the point of the award of an attorneys' fee

from a common fund recovery is not to inure a benefit to the general population in halting specific reprehensible action, but in encouraging otherwise unprofitable suits, without regard to the character of a defendant's actions.

Another rationale given for the aggregation of a common-fund attorneys' fee award is that the defendants would have no regard for the distribution of attorneys' fees from a fund award and that the number of plaintiffs in the class effects the distribution of the attorneys fees, because, generally, the marginal cost (per plaintiff) of the attorneys' fee award decreases with the introduction of each new plaintiff, lowering the average total cost per plaintiff for attorneys' fees. Both facts are true, but irrelevant. First, in the same manner that the defendants will have no interest in the disbursement of attorneys' fees, the defendant will have no interest in distribution of any common fund award among the plaintiffs. However, this does not convert a compensatory common fund award into an aggregate award. Second, the amount that each plaintiff will eventually receive in compensatory damages from the common fund award is intertwined with the number of plaintiffs who are members of the class. As the number of plaintiffs increases, the administrative costs per plaintiff of disbursing the award decrease, as do the attorneys' fees that must be paid by each class member, raising the eventual award to each class member. Still, this does not change the actual compensatory damage award to the class members into an aggregate whole.[7]

Aggregation is not agglomeration; an aggregate award is one in which the plaintiffs have an undivided interest and in which the benefit accrues entirely to each plaintiff. If the defendant's suggestion that attorneys' fee awards are aggregable is correct, then the entirety of an award of attorneys' fees on a common fund is attributable in its entirety to each individual plaintiff. However, if this were so, the amount of attorneys' fees would not increase with the introduction of each new plaintiff. Further, the purpose of the award out of the common fund, to prevent unjust enrichment

_____

[7] The observations of the magistrate in *Patterson* are also apposite:

Unlike an attorneys' fee awarded to a party and payable by the other party under a fee-shifting statute or contract provision, a fee taken from the common fund of the class recovery is not a separate and distinct form of relief comparable to punitive or compensatory damages, or even an injunction. Once the common fund of the class recovery is established from compensatory and, perhaps, punitive damages, class counsel's fee is *deducted* from it. It is the plaintiff class, not the defendant, that pays the common-fund attorneys' fee. Because the defendant does not pay the fee, it is not part of the "controversy" between the parties, any more so than the contingency fees collected by counsel in individual tort cases.

*Patterson v. Time Warner Operations, Inc.,* CV 97-TMP-2915-S at 13-14.

of any class member by requiring each plaintiff to pay *his or her fair share* of the attorneys fee, would make no sense, because there would be *no divisible share* — each plaintiff's interest in the award would be common and indivisible as to the whole amount.[8]

INJUNCTIVE RELIEF.

The complaint fails to set out the type of injunctive relief that would be sought by the

---

[8] The court notes that its reasoning with respect to a common-fund award of an attorneys' fee may not apply to all kinds of attorneys' fee awards involving exceptions to the American Rule.   In *Campbell v. General Motors Corporation*, — F. Supp. 2d at —, 1998 WL 637334 at * 8, the district court discussed whether aggregation of attorneys' fees could be had where the attorneys' fee would be claimed under the common-benefit doctrine:

> This equitable doctrine constitutes another exception to the American Rule, and allows a court to award attorneys' fees "when the efforts of the plaintiff's attorneys render a public service or result in a benefit to the general public in addition to serving the interests of the plaintiff." *Horn*, 1998 WL 32590, at *8-9; *see also Polonski v. Trump Taj Mahal Associates*, 137 F.3d 139, 145 (3d Cir.1998) (applies when litigants "confer a common benefit upon a class of individuals not participating in the litigation ") (emphasis added). The key difference is that no common fund need be created. In fact, fees can be awarded where the benefit bestowed is non- pecuniary, *see Bell v. Birmingham News Co.*, 576 So.2d 669, 670 (Ala.Civ.App.1991); *Barton v Drummond Co.*, 636 F.2d 978 (5th Cir. Unit B 1981), and the Alabama Supreme Court has awarded fees in several cases where there was no monetary recovery at all. *See, e.g., Brown v. State*, 565 So.2d 585, 591-92 (Ala.1990). Fees are typically assessed directly against the defendant. *See, e.g., id.; Barton*, 636 F.2d at 985. While the precise contours of common benefit recovery are far from clear, *see Polonski*, 137 F.3d at 146, plaintiffs have sought relief which may benefit the public at large, and so might be entitled to a payment of fees by the defendants based on the common benefit theory.
>
> The presence of common benefit, rather than common fund, fees in a case might well change the complexion of the aggregation question considerably. Common benefit fees could well be viewed as a common interest. By their very nature, such fees are not awarded as a separate recovery for each class member but instead are provided for the public benefit, to support the entire collective enterprise of the litigation. Moreover, they are paid directly to the class's attorneys. No payout to separate class members is ever made. Like statutory fees, which several courts have held can be aggregated, common benefit fees shift the cost of bringing the action onto the wrongdoer and so may be aggregable under *Tapscott*. *See Howard v. Globe Life Ins. Co.*, 973 F.Supp. 1412, 1420 (N.D.Fla.1996) (aggregating statutory fees).

This court notes that not all theories of common benefit recovery of attorneys' fees are the same and that it is likely that only in the case where, utilizing state law, application the common-benefit doctrine is premised on a "private attorney general" theory that aggregation might be appropriate. *See Alyeska Pipeline Service Company*, 421 U.S. at 266 (disavowing the private attorney general theory as a basis for awarding attorneys' fees, except where statutorily provided).

*Sprague v. Ticonic National Bank*, 307 U.S. 161, 166 (1939), while not addressing the issue, provides the factual backdrop and the reasoning to explain why not all common-benefit awards of attorneys' fees would permit aggregation. In *Sprague*, the petitioner's success on her claim "necessarily established the claims of fourteen other trusts pertaining to the same bonds." The Court stated that the petitioner could properly be awarded attorneys' fees on behalf of the other trusts under a common benefit theory, i.e., that the other trusts had benefitted from petitioner's suit. *Id.* at 167.   There was no implication in the suit, however, that the award was for the public benefit in general. Considering the matter counterfactually, if removal had been an issue, none of the premises behind aggregation existed in the application of the common-benefit doctrine in *Sprague*.

putative class in the instant case; instead, the complaint states that the court should provide such "injunctive relief as may be appropriate under Alabama law. . . ." The defendant suggests, however, that the named plaintiff likely seeks, on behalf of the putative class, injunctive relief that would preclude Midland from continuing to charge the property inspection fees. While the court had earlier concluded that this relief would accrue in the aggregate to the benefit of all plaintiffs, not just to each individual plaintiff, it now abandons that conclusion.

In determining whether the requested injunctive relief raises the amount in controversy over $75,000.00, the court must first determine how to evaluate that relief for purposes of calculating the amount in controversy. The Supreme Court has held that, in claims for injunctive relief, "the amount in controversy is measured by the value of [the injunction]." *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 347-48 (1977). Determining the value of the injunctive relief is generally a problematic endeavor, as the value of the relief for the plaintiff may differ from its value for the defendant. In his FEDERAL JURISDICTION, Erwin Chemerinsky complains:

> The problem that arises in valuing suits for injunctive or declaratory relief is that the amount in controversy varies depending on the perspective: is it the monetary harms the plaintiff will incur without the court relief; is it the costs the court's remedy will impose on the defendant; or is it the combination of both the plaintiff's harms and the defendant's costs? Some authority can be found to support many different approaches. There are many decisions holding that the jurisdictional amount in a suit for a declaratory judgment or injunction is determined by the harm the plaintiff will incur without court relief. In *Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.*, [239 U.S. 121 (1915),] the Court considered a suit to enjoin the defendant from interfering with the plaintiff's utility poles and wires. Although compliance would cost the defendant only $500, the Court found the jurisdictional amount requirement to be met based on allegations of the expenses that the plaintiff would incur without a favorable court decision.
> Other courts have said that the amount in controversy is determined by looking to the sum at stake for the party invoking federal court jurisdiction. [*See, e.g., McCarty v. Amoco Pipeline Co.*, 595 F.2d 389, 393 (7th Cir. 1979); *Thomas v. General Elec. Co.*, 207 F. Supp. 792 (D. Ky. 1962).] Thus, if the plaintiff files a suit for declaratory judgment or injunctive relief in federal court, the plaintiff's harms without the remedy determine the amount; but if the defendant is removing the case to federal court, then the cost to the defendant of complying with the proposed relief determines the amount.
> But the trend seems to be that the amount in controversy is met if *either* the plaintiff's harms or the defendant's costs of compliance will exceed $50,000. [*See Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348 (1961); *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389; *Smith v. Washington*, 593 F.2d 1097 (D.C. Cir. 1978).]

Erwin Chemerinsky, FEDERAL JURISDICTION, 2D EDITION, § 5.3.4, pp. 291-92 (1994).

In *Ericsson GE Mobile Communications, Inc., v. Motorola Communications & Electronics, Inc.*, 120 F.3d 216, 219 (11th Cir. 1997), the Eleventh Circuit Court of Appeals held, in the context of a

case filed initially in federal district court, that in determining the value of injunctive relief for purposes of federal jurisdiction, "this circuit has adopted the plaintiff-viewpoint rule."[9]

While the Eleventh Circuit Court of Appeals has resolved the issue of determining the value of injunctive relief in those cases in which the plaintiff initially files his or her claim in the district court, the court has yet to evaluate how the value of the injunctive relief is to be calculated in cases of removal.[10] Further, it is uncertain whether the justifications underlying the rule that the value of the injunctive relief is to be determined from the perspective of the plaintiff whose rights are being protected are applicable in the removal context.[11]

---

[9] It is not clear that the Eleventh Circuit Court of Appeals is bucking any trends here. In *Ericsson*, the Eleventh Circuit reports that the majority view is the plaintiff's perspective rule and this fact is also recorded in 15 MOORE ET AL., supra note 16, P 102.109[5], at 102-199. 14A CHARLES ALLEN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3703 (2d ed. 1987 & 1997 Supp.), notes that the picture is not so clear.

[10] In addition to *Ericsson* itself, the cases evaluated in *Ericsson* to reach the court's result all involved claims that had been *initially* filed in federal court.

[11] There is the additional, and somewhat intertwined, issue of what the court is to evaluate in determining the value of the injunction. In *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 609-610 (7th Cir. 1997), the Seventh Circuit Court of Appeals discussed different means of evaluating injunctive relief:

There are four ways in which a request for an injunction might be thought to carry a case over the amount in controversy threshold. The first way — plainly one valid way, *e.g.*, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 [] (1977); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 548 n. 4 (7th Cir. 1993); *Justice v. Atchison, Topeka & Santa Fe Ry.*, 927 F.2d 503, 505 (10th Cir. 1991); *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978), and some courts think the only valid way, *Kheel v. Port of New York Authority*, 457 F.2d 46, 49 (2d Cir. 1972); *Bernard v. Gerber Food Products Co.*, 938 F.Supp. 218, 220-22 (S.D.N.Y. 1996) — is if the value of the injunction to the plaintiff exceeds the statutory minimum. So we could look to the present value of the future cost savings that each plaintiff anticipated from the cessation of each defendant's price fixing. No effort to quantify this value or array of values in even the roughest terms has been made, however, so we put it to one side.

Although one of our cases adopts the "plaintiff only" position, *Freeman v. Sports Car Club of America, Inc.*, 51 F.3d 1358, 1362 (7th Cir. 1995), it overlooked a decision in which we had squarely rejected that position in favor of the "either viewpoint" (plaintiff's or defendant's) approach, *McCarty v. Amoco Pipeline Co.*, 595 F.2d 389 (7th Cir. 1979). Looked at from the defendants' standpoint, the minimum amount in controversy would be present if the injunction sought by the plaintiffs would require some alteration in the defendant's method of doing business that would cost the defendant at least the statutory minimum amount. *See, e.g., id.* at 391. This ground is not argued either. Often it will be equivalent to the previous ground, the value of the injunction to the plaintiff. The defendant would be willing to pay the plaintiff up to a shade less than the cost that the injunction would impose on the defendant to induce the plaintiff to abandon his quest for injunctive relief. In that way the cost to the defendant would be transmuted into an equivalent value to the plaintiff. If, however, there are multiple plaintiffs, actual or potential, the defendant will not be willing to pay each one as much as he would if there were only one possible plaintiff. It may seem paradoxical to defeat removal in the multiplaintiff setting on this basis. But it is implicit in the rule that forbids aggregation of class members' separate claims that it will sometimes be more difficult for a defendant desiring to remove a diversity case to federal court to establish the minimum amount of controversy in a multiplaintiff case

The leading case for the plaintiff's-perspective approach to valuing injunctions is *Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.*, 239 U.S. 121 (1915). In *Glenwood*, the plaintiff brought suit in the district court to enjoin the defendant from erecting poles and power lines that would interfere with those erected by the plaintiff. The district court, evaluating the value of the plaintiff's injunction from the perspective of the defendant, for whom the cost of removing the poles and wires would be less than the amount in controversy, dismissed the suit for lack of subject matter

---

than in a much smaller single-plaintiff case. Compare a class action in which one million class members each has a claim worth $1 with a case in which a single plaintiff has a claim worth $100,000. There is diversity jurisdiction in the second case but not (because of the nonaggregation rule in class actions, the rule of Snyder and Zahn) the first.

* * *

Still another way in which the requirement of the statutory minimum amount in controversy can be satisfied in an injunctive case is by showing that the injunction would force the defendant to forgo a benefit to him that is worth more than the threshold amount specified in the diversity statute, *e.g.*, *Grotzke v. Kurz*, 887 F.Supp. 53 (D.R.I. 1995), as where the suit asks that the defendant be enjoined from completing a lucrative transaction. That is not argued here either. The reason may be that while an injunction against price fixing might prevent a defendant from engaging in lucrative unlawful transactions, it would not deprive the defendant of a legally protected interest. It would not be like the case in which the defendant, in order to extirpate the effects of its unlawful act, is forced to restructure its operations at a cost that may greatly exceed any profit it made from the act. Structural relief is frequently decreed in merger cases under section 1 of the Sherman Act or section 7 of the Clayton Act or in monopolization cases under section 2 of the Sherman Act, but very rarely in a price-fixing case, such as we have here.

The last way of satisfying the requirement of the minimum amount in controversy in an injunction case, the way principally argued by the defendants, is that a defendant's clerical or ministerial costs of compliance might carry a case across the threshold. Even if an injunction doesn't require the defendant to restructure its business or give up a lucrative lawful business opportunity, but merely tells it to stop doing something illegal, such as conspiring to fix prices, there will be lawful costs of compliance. Just the cost of duplicating an injunction in a case such as this and distributing the copies to all the relevant personnel might exceed $50,000 for each defendant, and, if so, this would argue for allowing removal to federal court. The argument would be the same as before — given the possibility of a settlement, a suit is worth as much to the plaintiff in the form of an expected value of settling it as it is costly to the defendant, at least in the single- plaintiff case. But if the argument were accepted, then every case, however trivial, against a large company would cross the threshold, whether the threshold was $50,000 or as it now is $75,000, even if the plaintiff were asking for an injunction against disclosing his unlisted telephone number. It would be an invitation to file state-law nuisance suits in federal court.

In fact, the Seventh Circuit Court of Appeals did not fully catalogue all of the ways in which an injunction could be valuated and two of the manners it suggested involved precisely the same valuation, taken from different perspectives. While the term "the value of the injunction," as used by that court, referred to the economic value of the injunction itself — i.e., the amount that the plaintiff or plaintiffs are willing to accept or defendant or defendants are willing to pay in lieu of an injunction, a more historically grounded object of valuation is the impact on the right that the plaintiff or defendant is seeking to vindicate in the litigation. Fifth and Eleventh Circuit Court of Appeals cases have historically focused on this notion of the plaintiff's right, rather than the economic value of the injunction to the plaintiff. *See infra.* There is, of course, the problem of determining what is meant by and how to identify any "right" to be vindicated; such a solution is, perhaps, no solution.

jurisdiction. The Supreme Court reversed, stating:

> We are unable to discern any sufficient ground for taking this case out of the rule applicable generally to suits for injunction to restrain a nuisance, a continuing trespass, or the like, viz., that the jurisdictional amount is to be tested by the value of the object to be gained by complainant. The object of the present suit is not only the abatement of the nuisance, but (under the prayer for general relief) the prevention of any recurrence of the like nuisance in the future. In *Mississippi & M. R. Co. v. Ward*, [67 U.S. (2 Black) 485], 492 [(1862)], it was said: 'The want of a sufficient amount of damage having been sustained to give the Federal courts jurisdiction will not defeat the remedy, as the removal of the obstruction is the matter of controversy, and the value of the object must govern.' The same rule has been applied in numerous cases, and under varying circumstances. *Scott v. Donald*, 165 U. S. 107, 115 [(1897)]; *McNeill v. Southern R. Co.*[,] 202 U. S. 543, 558 [(1906)]; *Hunt v. New York Cotton Exch.*[,] 205 U. S. 322, 336 [(1907)]; *Bitterman v. Louisville & N. R. Co.*[,] 207 U. S. 205, 225 [(1907)]; *Berryman v. Whitman College*, 222 U. S. 334, 345 [(1912)].
>
> The district court erred in testing the jurisdiction by the amount that it would cost defendant to remove its poles and wires where they conflict or interfere with those of complainant, and replacing them in such a position as to avoid the interference. Complainant sets up a right to maintain and operate its plant and conduct its business free from wrongful interference by defendant. This right is alleged to be of a value in excess of the jurisdictional amount, and at the hearing no question seems to have been made but that it has such value. *The relief sought is the protection of that right, now and in the future, and the value of that protection is determinative of the jurisdiction.*

Id. at 125-26 (emphasis added). This conception of determining the value of the object of the relief grew out of the Court's focus on the right to be protected. Because a private action was undertaken to protect a right vested by the common law or statute in the plaintiff, the value of an injunction to prevent damage to a plaintiff's right was the value of the damage to the plaintiff's right itself, rather than the cost to defendant of foregoing the action that would bring harm to the right. Superficially, calculating the amount in controversy was easy — look to the amount of actual or potential damage to the right of the plaintiff, the same as if the plaintiff sought monetary relief for damage to the right after the fact. In practice, effectively determining the contours of the right involved was more difficult. *See First Nat. Bank of Columbus, Ohio v. Louisiana Highway Commission*, 264 U.S. 308 (1924) (suit to enjoin the use of funds to pay a contractor to build a highway in a location not subject matter affecting plaintiff's rights). *See also Healy v. Ratta*, 292 U.S. 263, 268-69 (1934) (determining that the tax plaintiff would be required to pay — i.e., the funds to which plaintiff asserted a right — was the matter in controversy in a suit to enjoin imposition of a license tax, not the right to do business in the state). In ascertaining the value of the plaintiff's right that the defendant was being enjoined from harming, the court disavowed calculating any incidental or collateral effects of the

prospective damage. Id. at 268.[12] *But see Louisville & Nashville R. R. Co. v. Smith*, 128 F. 1, 5 (5th Cir. 1904) (right to run railway over perpetual easement, not right to each individual easement across each property owner's land, the matter in controversy).

In *Alfonso v. Hillsorough County Aviation Authority*, 308 F.2d 724, 727 (5th Cir. 1962), the Fifth Circuit Court of Appeals held that the amount in controversy in a suit to enjoin an airport from using expanded runways for the departure and return of airplanes was the value of the "right complainant . . . sought to protect by its suit," not "the value of the air rights *to the defendants*." Referring to earlier Supreme Court opinions, the Fifth Circuit Court of Appeals thus concluded that matter in controversy was resolved with respect to the plaintiff's rights. *Id.*; *Louisville & Nashville R. R. Co. v. Smith*, 128 F. at 5; and *Vraney v. County of Pinellas*, 250 F.2d 617, 618 (5th Cir. 1958) (citing earlier Supreme Court opinions for the position that the value of the plaintiff's right to be protected is the amount in controversy).

Turning the matter on its head, in a suit in which a plaintiff seeks an injunction to protect a right, the defendant opposing the injunction also seeks to vindicate a right to engage in the conduct plaintiff seeks to enjoin. In this sense, for the defendant, the matter in controversy is its right to carry out its planned course of action or forego acting in a certain way. Arguably, then, in removing the action to the district court, the defendant is seeking to vindicate that right in the district court, not to pursue the plaintiff's right. The matter in controversy for the removing party is, in that sense, the impairment of its right by the threatened injunction.

In *Kheel v. Port of New York Authority*, 457 F.2d 46, 48-49 (2d Cir. 1972), the Second Circuit Court of Appeals stated, concerning the plaintiff's-view approach to valuing an injunction:

> The district court dealt only with the issue of the presence of a federal question to

---

[12]      The first time at which the point appears to have been bruited in the Supreme Court was 1862 in *Mississippi & Missouri R.R. Co. v. Ward,* a suit in equity to compel the removal of a bridge which interfered with the plaintiff's navigation of the Mississippi River. In no more than a passing mention the Court held that 'the removal of the obstruction is the matter of controversy, and the value of the object must govern.' That was at best ambiguous; indeed, it apparently meant that the value of the bridge, or at least of so much of it as the plaintiff wished to have removed, was the test. However that may have been, the value of 'the matter in controversy' was construed to mean the value of 'the object to be gained by complainant'; and in the case of taxes, or of license fees, it is now settled that it is the value of the taxes or of the fees, which the plaintiff will be obliged to pay, if they are valid.

*M & M Transportation Co. v. City of New York*, 186 F.2d 157, 158 (2d Cir. 1950).

confer jurisdiction on the court. We find it unnecessary to reach that point, however, for plaintiffs did not show the requisite $10,000 in controversy as required for federal jurisdiction under 28 U.S.C. S 1331. The burden of proving jurisdictional prerequisites lies on the party who seeks the exercise of jurisdiction in his favor. "[I]nquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf . . . [H]e must carry throughout the litigation the burden of showing that he is properly in court." *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 [] (1936); *Post v. Payton*, 323 F.Supp. 799, 804 (E.D.N.Y. 1971).

Generally, for this reason, the amount in controversy is calculated from the plaintiff's standpoint; "the value of the suit's intended benefit" or the value of the right being protected or the injury being averted constitutes the amount in controversy when damages are not requested. *Massachusetts State Pharmaceutical Assn. v. Federal Prescription Service*, 431 F.2d 130 (8th Cir. 1970); Wright, Federal Courts SS 33, 34 (2d ed. 1970).

The rationale behind calculating the value of an injunction in cases filed initially in the federal district court stated in *Kheel*, that it is a plaintiff's burden to demonstrate the existence of jurisdiction, can be extended to defendants in the removal context. Because the defendants bear the burden of demonstrating jurisdiction in removing the case to federal court, they should also be required to demonstrate that, for them, the value of the injunction rises to the amount in controversy level.

In *Family Motor Inn, Inc., v. L-K Enterprises Div., Consolidated Foods Corp.*, 369 F. Supp. 766, 768-69 (E.D. Ky. 1973), the district court for the Eastern District of Kentucky elaborated:

There is no comprehensible reason to take issue with the majority rule that, in actions initiated in federal court for injunctive relief, the amount in controversy should be ascertained with reference to the plaintiff. However, the court questions the application of that rule to actions removed from a state forum. While there is normally little jurisdictional distinction between a removed case and one brought originally in the federal court, the special characteristics of certain disputes have generated several exceptions to this principle. For example, the amount in controversy is ordinarily determined with reference to the complaint, whatever the origin of the case; however, where the complaint is silent regarding monetary damages, the court may turn to the petition for removal.

"With respect to removability of a case from a state to a federal court, the jurisdictional amount is ordinarily that amount which is claimed by the plaintiff in his complaint and not that which is alleged in the defendant's petition for removal, but if the complaint does not set forth the amount in controversy, the court may look to the petition for removal." 32 Am.Jur.2d "Federal Practice and Procedure" Section 162, at p. 605.

Noting the distinction between removed cases and those originally filed in this forum, the district court for the Western District of Kentucky held in *Thomas v. General Electric Co.*, W.D.Ky., 207 F.Supp. 792 (1962), that the amount in controversy may be determined with reference to the defendant's anticipated monetary loss. In *Thomas*, the complaint alleged that the defendant's practice of photographing employees at work was an invasion of privacy; injunctive relief and one dollar in damages were sought. Alleging an annual cost of $90,000 if relief were granted, defendant removed the action to federal court. Plaintiff argued through its motion to remand that the requisite jurisdictional amount was not reflected in the complaint and could not be satisfied by allegations in the petition for removal. Although the "plaintiff viewpoint" rule was recognized as the majority position,

the court opined that the cases espousing that application were distinguishable from those involving actions removed from state court:

> "(I)t is apparent from the language quoted from the opinions that the value of the matter in controversy is to be tested by its value to the party who has the burden of proving jurisdictional amount. . . .
>
>       * * *
>
> When defendant . . . filed its petition for removal of this action . . . it assumed the burden of establishing the jurisdiction of this Court, and for that purpose the defendant would appear to have the same status as the plaintiffs in the Supreme Court cases reviewed here." Id. at 798.

*See also Steele v. Underwriters Adjusting Co., Inc.*, 649 F. Supp. 1414, 1416 (M.D. Ala. 1986)

(following *Family Motor Inn*).

In *Hatridge v. Aetna Casualty & Surety Co.*, 415 F.2d 809, 815 (8th Cir. 1969) (Blackmun, J.),

the Eight Circuit Court of Appeals commented on the perspective from which the value of the matter

in controversy should be determined in when a defendant attempts removal from state court:

> Where, as here, federal diversity jurisdiction is asserted by the defendant pursuant to the removal statute, 28 U.S.C. § 1441(a), jurisdiction is customarily geared to original jurisdiction under § 1332(a). 1A Moore's Federal Practice par. 0.157(6), at 257 (2d ed. 1965). The party asserting federal jurisdiction, here Aetna, then has the burden of establishing that the required amount is in controversy. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); 1 Moore's Federal Practice par. 0.92(3.-2) (2d ed. 1964); 1A Moore's Federal Practice par. 0.157(6), at 258.
>  There are, however, instances where the courts have measured the 'matter in controversy' from the standpoint of the defendant. Thus we have broad statements directed to either party to the litigation:
> 'It is conceded that the pecuniary value of the matter in dispute may be determined * * * in some cases * * * by the pecuniary result to one of the parties immediately from the judgment.' *Smith v. Adams*, 130 U.S. 167 [] (1889).
> 'The pleading and the evidence * * * must show such required amount to be of the value of the particular and limited thing sought to be accomplished by the action. The value of the "thing sought to be accomplished by the action" may relate to either or any party to the action'. *Ridder Bros. v. Blethen*, 142 F.2d 395, 399 (9th Cir. 1944).
> *Government Employees Ins. Co. v. Lally*, 327 F.2d 568, 569 (4th Cir. 1964). There are specific holdings, favorable to federal jurisdiction, where the defendant's posture yields the jurisdictional amount. *Ridder Bros. v. Blethen, supra; Pennsylvania Ins. Co. v. Allstate Ins. Co.*, 226 F. Supp. 99 (W.D. Va.1964); *Shipe v. Floral Hills, Inc.*, 86 F. Supp. 985, 987 (W.D. Mo.1949). Professor Wright has recognized this line of authority and has observed that 'this seems the desirable rule, since the purpose of a jurisdictional amount, to keep trivial cases away from the court, is satisfied where the case is worth a large sum to either party.' C. Wright, FEDERAL COURTS § 34, at 100 (1963).

This court notes that the defendant, not the plaintiff, is seeking entry into the federal courthouse.

Given that fact, the defendant should be required to demonstrate that, for it, the value of the

proposed injunctive relief is greater than $75,000.00, and that, from its perspective, the removal is proper.

The Seventh Circuit Court of Appeals has, however, criticized an approach in which the value of an injunction is determined according to which party seeks entry to federal court. In *McCarty v. Amoco Pipeline Company*, 595 F.2d 389, 393 (7th Cir. 1979) the court stated:

> Although this rule has certain attractive features such as tying the controlling viewpoint to the burden of proof as to jurisdiction, two problems with it arise. The first is the possibility of anomalous results. Under the rule, if a case originally brought in federal court were dismissed for failure to meet the jurisdictional amount from the plaintiff's viewpoint, it could yet end up in federal court if the plaintiff reinstituted the case in state court and the defendant from whose point of view the required amount was present then removed it. See 14 Wright, Miller & Cooper, Supra at 410. This possibility introduces the second, more fundamental problem. 28 U.S.C. § 1441 only provides for the removal of actions "of which the district courts of the United States have original jurisdiction . . . ." Thus, it is generally true that if a case could not originally be brought in federal court it may not be removed there. But as outlined above, the "burden of proving jurisdiction viewpoint" rule could lead to a situation where the federal court would assume removal jurisdiction where it could not assert original jurisdiction. Being thus contrary to the statutory directive, the second rule is not a viable interpretation. See 1 Moore's Federal Practice, ¶ 0.91(1), pp. 845-46 n. 10 (1978).

The problem raised by premising the value of an injunction on its value to the party asserting jurisdiction also exists where an "either/or" rule is applied in the removal context and the plaintiff's-view rule is applied in cases filed initially in federal court. Applying an "either/or" rule to removing parties alone, although a plaintiff could not file his case in the district court by showing that the value of the injunction to the defendant exceeded the amount in controversy, the defendant could remove the plaintiff's case to federal court on that very same grounds, outside the bounds of the court's original statutory jurisdiction.

To avoid these difficulties, the court could adopt a rule that a removing defendant must demonstrate, to the proper standard, that the value of the injunction <u>both</u> to it and any plaintiff exceeds $75,000.00. In doing so, the scope of removal jurisdiction would not be extended beyond the court's original jurisdiction and some requirement that a defendant seeking entry into the federal court show that its right to engage in the practice of which the plaintiff complains has a value to the defendant meeting the jurisdictional amount would be preserved. However, it is not necessary to further address such issue at this time.

A potential aggregation problem posed by defendant-oriented approaches was raised in

*Massachusetts State Pharmaceutical Association v. Federal Prescription Service, Inc.*, 431 F.2d 130, 131 (8th Cir. 1970).  In a suit bought by a putative class of plaintiffs to enjoin Iowa defendants from violating a judgment of a Massachusetts court, the Eight Circuit Court of Appeals found that the plaintiffs could not bring their claims in federal court because the value of each plaintiff's right in the enforcement of the judgment was less than the amount in controversy.  The court refused to determine the amount in controversy from the perspective of the defendant, stating:

> In light of *Snyder v. Harris*, 394 U.S. 332 [], holding that only plaintiffs who have a common and undivided interest in a single title or right may aggregate their claims to reach the jurisdictional amount, we are of the view that the 'plaintiff's viewpoint' rule is the only valid rule.  In a class action where the aggregate amount of damages to the class exceeds $10,000, the value of the thing to be accomplished by the action, (judgment for the aggregate amount) as to the defendant exceeds the jurisdictional amount.  *Snyder v. Harris*, [] 394 U.S. [at 353] (dissenting opinion).  The Court in *Snyder* does not recognize the presence of the jurisdictional amount in that situation. The holding can only be interpreted as precluding the valuation of the amount in controversy from the defendant's viewpoint.  To hold otherwise would in effect permit aggregation of claims contrary to the teaching in *Snyder*.

*Id*. at 132 n.1.

The problem outlined in *Federal Prescription Services* is a problem specific to class claims brought into federal court.  The problem is that in valuing an injunction from a defendant's perspective it is difficult not to aggregate the value of the injunctions into a single whole when determining the cost to the defendant of compliance with the injunction.  Because such aggregation of damages is not appropriate for the determination of the amount in controversy in class actions, the court cannot, under this analysis, evaluate the value of the injunction from the defendant's perspective.  The solution to this problem depends on the type of injunctive relief sought.  If the relief is a "common and undivided interest" of the plaintiff, no *Snyder* problem will arise, because aggregation is appropriate.  If the injunctive relief sought is specific to each plaintiff, the value of the injunction can be pro-rated among the class members.[13]

The defendants argue that any injunctive relief sought by the plaintiffs should be aggregated in order to determine whether the value of that relief places the amount of each plaintiff's claims over $75,000.00.  The plaintiff argues that aggregation of claims for injunctive relief is entirely

---

[13] A curious consequence of this may be that, where the cost of the relief to the defendant is divided among the class members, more plaintiffs may lower the amount in controversy because the marginal cost of the defendant's compliance lowers with each new plaintiff.  Of course, removal would be inappropriate in such a case because the value to the defendant of the injunction with regard to each plaintiff would be less than the jurisdictional requirement.

inappropriate.

The court is aware of the split of opinion in the Northern District on the issue of whether the value of injunctive relief can, as a general matter, be aggregated to satisfy the amount in controversy requirement of § 1332(a)(1). In *Edge v. Blockbuster Video, Inc.*, — F. Supp. —, —, 1997 WL 910414, CV 96-B-2341-S (N.D. Ala. 1997), the district court determined that the value of an injunction to prohibit the defendant from charging excessive late fees on rented videotapes was aggregable. In so doing, the court reasoned that the factors outlined in *Tapscott* compelled a result that injunctive relief be generally considered "common and undivided":

> Applying the factors outlined above, the court is of the opinion that the present action's proposed injunctive relief is a common and undivided interest of the plaintiff class. The effect of the injunction as to any individual plaintiff would be small (one or two dollars per late videotape), but the course of conduct by Blockbuster is large. Further, the effect of the injunction would be to deter (or prohibit) the course of conduct as a whole. In the present case, the plaintiffs seek an injunction prohibiting Blockbuster from charging late fees in excess of the fee charged for the initial rental period. The complaint seeks this relief on behalf of the "class as a whole." If certified, this class would consist of almost 29 million plaintiffs. (See Barrett Aff. P 9).
>
> Furthermore, Blockbuster is entirely disinterested in the distribution of the injunctive relief. As noted, Blockbuster's evidence suggests that the potential class is close to 29 million customers. As Blockbuster's president of its domestic division stated, "it would be administratively impossible to comply with an injunction by distinguishing between class members and non-class members." (Barrett Aff. P 11). Thus, if an injunction were imposed, the defendants would be indifferent as to whether the actual class consisted of 29 million or 15 million or 40 million. The value of the "object of the litigation" would remain between $65 and $100 million per year, and the effect of the injunction would be the same — Blockbuster would not charge any customer (class member or not) a late fee in excess of the initial rental rate.
>
> To the extent an injunction would be justified by Blockbuster's actions, it would deter a course of conduct as a whole and would inure to the "public benefit — the collective good." Blockbuster does not distinguish between customers; it charges every customer the same increased late fees. Substituting "injunction" into the language from *Tapscott*, "[w]hen [an injunction] reflect[s] the defendant's course of conduct towards all of the putative class members, it is entirely proper that the damages be considered in the aggregate." *See Tapscott*, 77 F.3d at 1359. Unlike contract damages, where one plaintiff's recovery does not necessitate another's recovery, to the extent that one plaintiff is entitled to injunctive relief, all plaintiffs are entitled to injunctive relief. Thus, the relief sought is common and undivided as to the class as a whole.
>
> Furthermore, just as with punitive damages, plaintiffs are not entitled to an injunction as a matter of right. An injunction is an equitable remedy that is issued at the discretion of the court. The fact that no plaintiff has an individual right to an injunction (unlike damages for breach of contract) enhances the collective nature of the proposed injunctive relief. The injunction would be for the benefit of the class and not for the benefit of any one plaintiff. Thus, aggregation of the value of the injunctive relief is proper, and the jurisdictional amount in controversy requirement of 28 U.S.C. § 1332 is satisfied.

Plaintiffs argue that because each class member could seek money damages and an injunction on his or her own, the interests of the plaintiffs in an injunction are separate and distinct. In *Tapscott*, however, each putative class member could have sought punitive damages on his or her own, but the Eleventh Circuit held that those damages were properly aggregated, nonetheless. Thus, plaintiffs argument is without merit.

*Id*. at *5-6, 10-12 (footnotes omitted).

In *Patterson v. Time Warner Operations, Inc.*, CV 97-TMP-2915-S (N.D. Ala. 1998), a case involving an injunction to prevent the defendants from assessing excessive late fees, the magistrate came to entirely different result.

The leading case in the Eleventh Circuit on the assessment of the value of injunctive relief for purposes of meeting the jurisdictional amount is *Ericsson GE Mobile Communications, Inc., v. Motorola Communications & Electronics, Inc.*, 120 F.3d 216, *reh'g denied*, 130 F.3d 446 (11th Cir. 1997). In that case, the appellate court made clear that the value of injunctive relief is assessed from the *plaintiff's* point of view. Quoting the old Fifth Circuit case of *Vraney v. County of Pinella*, 250 F.2d 617, 618 (5th Cir., 1958), the court emphasized that it is "'the value to the plaintiff of the object or right sought to be enforced'" that is the measure of the amount in controversy when the relief is an injunction. Similarly, relying on *Alfonso v. Hillsborough County Aviation Authority*, 308 F.2d 724, 726-27 (5th Cir., 1962), the current court wrote, "the Alfonso court stated that '[t]he value to the plaintiff of the right to be enforced or protected determines the amount in controversy' and concluded that the alleged damage to the homes of the individual plaintiffs was insufficient to satisfy the amount in controversy requirement."

The reliance of the current court on these cases is instructive for two reasons. First, the court makes clear that the amount in controversy is determined from the plaintiff's viewpoint. Also, the particular outcome in *Alfonso* re-emphasizes that the value of the right sought to be protected by injunctive relief is measured separately for each individual plaintiff. Stated another way, the value of the injunctive relief is not aggregated; the court must determine the value of the injunctive relief as to each individual plaintiff and not the group or class of plaintiffs as a whole.

*Id*. at 9-11. The magistrate elaborated further in a footnote:

Defendant . . . relies greatly on Judge Blackburn's decision in *Edge v. Blockbuster Video*, CV-96-B-2341-S, to argue that injunctive relief, like punitive damages discussed in *Tapscott*, is a "common and undivided" interest held by the entire class, not separate and distinct claims of class members. This reasoning simply means that injunctive relief in *every* class action is valued from the point of view of the defendant, contrary to the holding in *Ericsson*. An injunction granted in favor of a class against a defendant, if it is an undivided interest held by the class in common, will always mean that the value of the injunction is measured by its impact on the defendant, not its value to the plaintiffs. An injunction has no value to a *class*; it has value only to the extent it protects the rights of *individual* plaintiffs who may seek to enforce it. In sum, this court believes that the clear teaching of *Ericsson* is that the value of injunctive relief is measured from *each* individual plaintiff's point of view, not he defendant's point of view.

*Id*. at 10 n.11.

Apparently, the magistrate's opinion in *Patterson* makes an inference from a requirement that injunctive relief be assessed from the perspective of each individual plaintiff to a conclusion that the value of injunctive relief for each plaintiff in the class is separate and distinct and cannot be aggregated.[14]  If there is a fallacy, it lies in treating an aggregate claim for injunctive relief as requiring amalgamation of the injunctions accruing to each plaintiff.  While the value of an injunction is to be viewed from the perspective of each plaintiff, an aggregate claim is not the added mass of the injunctive relief.  Instead, an aggregable claim is one that can fairly be attributed, in the whole amount, to each plaintiff.  The situation is similar to a joint tenancy, in which all joint tenants have equal right to possess and enjoy the property to its fullest extent, *see Porter v. Porter*, 472 So.2d 630, 633 (Ala. 1985) — each individual having a "common and undivided" title or right has attributable to her or him the entire value of the claim.[15]  In the case of a "common and undivided" right or title, any plaintiff could bring the suit arguably exhausting its total value, whether the entirety of that benefit inures to the single plaintiff — for example on a claim for punitive damages based on a course of conduct by a defendant, as in *Tapscott* — or to the entire range of plaintiffs sharing the right — for example, where one plaintiff sues to abate a nuisance by defendant and all potential plaintiffs benefit by the abatement.  Essentially, any one of the potential number of plaintiffs could be substituted for or added to the plaintiff suing on the right without altering the character of the right.  *See Shields v. Thomas*, 58 U.S. (17 How.) 3 (1854) (holding, where plaintiff brought suit in federal district court in Iowa to enforce a decree obtained in the chancery court of Kentucky, that plaintiffs' suit reached the amount in controversy because, even though the apportionment to each plaintiff in the Kentucky decree was below the amount in controversy, all sued for identical relief in the district court, i.e., that the defendant be compelled to pay under the Kentucky decree).

At the same time, Patterson highlights a genuine concern that a court will determine the aggregate value of an injunction from the perspective of the defendant and then attribute that value

---

[14]  This is only a possible reading.  The magistrate's opinion could be read not to extend so far.

[15]  A clear example of a claim in which a plaintiff would clearly have a common and undivided interest with other plaintiffs would be a claim by joint tenants for abatement of a nuisance by a polluting defendant.  The benefit of the injunction in such a case would be indivisible, as each tenant would get the same benefit if he alone or in concert with others sought the injunction.  The claim would be of precisely the same value regardless of who or how many brought it and the value of the entire claim to one is the same as to all.

to each of the individual plaintiffs. As noted in *Federal Prescription Services,* "[t]he Court in *Snyder* does not recognize the presence of the jurisdictional amount in that situation." The aggregated claim must involve a "common and undivided" right shared by the *plaintiffs. Cf. Troy Bank of Troy, Indiana, v. G.A. Whitehead & Co.,* 222 U.S. at 40-41. Since the value of an injunction is, in any case, necessarily measured by the value of the right of the plaintiff that is being protected, it is with reference to this right that the determination of aggregation must be made. The court in *Edge* did not attend to this fact and, as a result, examined whether the *injunction* against Blockbuster would itself be one or many. Given that the injunction would be secured against the actions of a single defendant and require that defendant, in perpetuity, not perform essentially one act, the value of the injunction could not but have been considered aggregate relief.

Aggregation of injunctive relief is inappropriate here. Perhaps if an injunction was issued, future suits arising under the injunction would provide a common and undivided right of relief, but at present, each prospective plaintiff's right for relief is his or her own. On an individual basis, the defendant has not shown that the value of the injunction for each named and putative plaintiff is greater than the $75,000.00 amount in controversy, only that if the injunction were granted, its costs would exceed $75,000.00.

ADDITION OF AMOUNTS.

Although not addressed by the district court, the defendant, in its notice of removal, contended that, whatever the value of the injunctive relief, when added to the $75,000.00 limitation on damages stated at the end of the plaintiff's complaint, the value of that relief raises the amount in controversy to over $75,000.00. The defendant bases it calculation that the injunctive relief will cause the amount in controversy to exceed $75,000.00 on the theory that the amount of damages requested by each plaintiff is $75,000.00 and that they need only demonstrate that the injunctive relief claimed by any plaintiff be valued at a minimum of $0.01 to satisfy the amount in controversy requirement. This is an inappropriate calculation. Instead of estimating the value of each plaintiff's monetary damages, the named plaintiff has chosen to *limit* on behalf of the class the maximum amount recoverable; the actual amount of damages could be far below that maximum in any case. Therefore, up to the $75,000.00 limitation, the defendants must show by a preponderance of the evidence an amount of monetary damages in addition to proving to a preponderance of the evidence a value of

the injunctive relief.

BANKRUPTCY JURISDICTION.

The bankruptcy removal statute, 28 U.S.C. § 1452, permits a party to remove to federal court almost any civil action "if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Bankruptcy jurisdiction, as vested in the district courts through 28 U.S.C. § 1334(a) & (b), is exclusive as to all cases under title 11 and original (though not exclusive) as to "all civil proceedings arising under title 11, or arising in or related to cases under title 11." While the instant claim is not a case under the bankruptcy code (title 11), it is related to a bankruptcy action, i.e., the claim of Midland that the plaintiff, as a debtor, has agreed to repay in his Chapter 13 plan.

Nonetheless, this court may remand the case for equitable reasons. 28 U.S.C. § 1452(b). In *Thomasson v. AmSouth*, 59 B.R. 997, 1001 (N.D. Ala. 1986), the district court listed equitable grounds on which a remand may be premised:

> Equitable grounds include: (1) forum non conveniens; (2) a holding that, if the civil action has been bifurcated by removal, the entire action should be tried in the same court; (3) a holding that a state court is better able to respond to questions involving state law; (4) expertise of the particular court; (5) duplicative and uneconomic effort of judicial resources in two forums; (6) prejudice to the involuntarily removed parties; (7) comity considerations; and (8) a lessened possibility of an inconsistent result. *See Browning v. Navarro*, 743 F.2d 1069, 1076 n. 21 (5th Cir.1984).

This court finds that the state court is better equipped to resolve the issues presented in the present case. This case involves interpretations of state law and, if certified, the claims may not relate solely to the single debtor in this action, but also to non-bankruptcy plaintiffs.

## Conclusion

For the forgoing reasons, this action will be REMANDED to the Circuit Court of Jefferson County, Alabama.

DONE and ORDERED this _____ day of December 1998.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE